| | | |
|---|---|---|
| **KUMAR ROOPCHAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:09-CV-177** |
| | ) | **(Phillips)** |
| **ADT SEC. SYS., INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant ADT Security System, Inc's ("ADT") Motion for Summary Judgment. [Doc. 28]. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, ADT has moved for summary judgment on each of Plaintiff's claims.

In December 2006, Plaintiff contracted with ADT to have a security system installed at his convenience store. [Plaintiff's Complaint, Doc. 29-8, at 2, ¶ 7]. Under the contract, ADT agreed to provide cameras, alarm detectors, and other security equipment. [Id.]. In return, Plaintiff paid ADT a monthly fee. [Id.]. The contract also contained an exculpatory clause, under which Plaintiff agreed to allocate any risk of property damage or loss to his insurance company. [December 2006 Commercial Sales Proposal/Agreement, Doc. 29-3]. In March 2007, Plaintiff and ADT executed a second contract. [December 2006 Commercial Sales Proposal/Agreement, Doc. 29-3]. Like the previous contract, Plaintiff agreed to allocate any risk of property damage or loss to his insurance company. [Id.].

On November 28, 2008, nearly two years after the security system was installed, Plaintiff's

store was burglarized. [Plaintiff's Complaint, Doc. 29-8, at 3-4, ¶¶ 11-18]. Approximately one week later, a truck drove into the front door of Plaintiff's store. [Id., p. 4, ¶¶ 19-26]. No items were stolen during this incident, but the truck caused structural damage. [Id.]. In addition, Plaintiff alleges that he suffered lost profits during the thirty-five days that his store was closed for repairs. [Id.].

On March 19, 2009, Plaintiff filed suit against ADT in the Circuit Court for Knox County, Tennessee. [Notice of Removal, Doc. 1]. On April 23, 2009, the case was removed to federal court. [Id.]. Plaintiff has sued ADT for claims of: (1) intentional misrepresentation; (2) fraudulent concealment; (3) fraudulent inducement; (4) negligent misrepresentation; (5) negligence; (6) breach of contract; and (7) violating the Tennessee Consumer Protection Act ("TCPA"), T.C.A. § 47-18-101 *et seq*. [Plaintiff's Complaint, Doc. 29-8]. In sum, Plaintiff is attempting to hold ADT liable for the property damage and loss caused by the two incidents. [Id.].

The following issues are before the Court. First, has Plaintiff raised a genuine issue of material fact regarding his claims for intentional misrepresentation, fraudulent concealment, fraudulent inducement, negligent misrepresentation, and TCPA violations? If Plaintiff has not raised a genuine issue of material fact regarding any of these claims, then his negligence and breach of contract claims are barred by the exculpatory clauses in the December 2006 and March 2007 contracts. For the following reasons, ADT's Motion for Summary Judgment [Doc. 28] is **GRANTED**, whereby Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

## I.    BACKGROUND

Plaintiff is the owner of a convenience store and gas station, the "Spring Hill Market," located at 5016 Ruthledge Pike, in Knoxville, Tennessee (the "Store"). [Plaintiff's Complaint, Doc.

29-8, at 1, ¶ 1]. ADT is a corporation that provides security equipment and services to residential and commercial customers. [Id., p.2, ¶ 6]. On December 9, 2006, Plaintiff met with ADT salesperson, Joe Flack ("Mr. Flack"), to discuss having a security system installed at the Store. [Plaintiff's Dep., Doc. 29-1, at 38:7-40:21, April 8, 2010].

One of the most important services that ADT provides is alarm monitoring. [Id., at 70:15-71:19]. When a break-in occurs, there are two ways that ADT is notified. [Id.]. First, ADT may receive an alarm signal from a security system that is based upon traditional phone lines (or land-lines). [Id.]. Second, ADT may receive an alarm signal from a security system that is based upon a cellular back-up. [Id.]. A cellular back-up provides an additional layer of protection because it sends alarm signals even when a telephone line is damaged. [Id.].

After Mr. Flack explained ADT's services, Plaintiff signed a Commercial Alarm Services Contract (the "2006 Contract"). [2006 Contract, Doc. 29-3]. Only Plaintiff, Mr. Flack, and an ADT technician were present when the 2006 Contract was signed. [Plaintiff's Dep., Doc. 29-1, at 46:4-19]. The 2006 Contract did not provide for a cellular back-up. [2006 Contract, Doc. 29-3; *see also* John Gose Affidavit, Doc. 29-2].

On March 20, 2007, the parties executed a second contract (the "2007 Contract"). [2007 Contract, Doc. 29-4]. Like the previous contract, the 2007 Contract did not provide for a cellular back-up. [Id., *see also* John Gose Affidavit, Doc. 29-2]. The 2007 Contract was identical to the 2006 Contract, except that ADT agreed to provide additional security equipment. [*Cf.* 2006 Contract, Doc. 29-3, with 2007 Contract, Doc. 29-4]. The contracts had the same standard terms and conditions. For example, Plaintiff agreed that ADT was only required to install equipment expressly listed in the contracts:

> Customer acknowledges that: (a) ADT has explained the full range of protection, equipment, and services available to Customer; (b) additional protection over and above that provided herein is available and may be obtained from ADT at an additional cost to the Customer; and (c) **Customer desires and has contracted for only the equipment and services itemized on this Agreement.**

[Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, Doc. 29, at 4] [emphasis added]. Once again, the Contracts did not provide for a cellular-back-up. [*See* Doc. 29-3 and Doc. 29-4].

The contracts also contained an exculpatory clause. [Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, Doc. 29, at 4-5]. Under that clause, Plaintiff agreed to allocate any risk of property damage or loss to his insurance company.[1]

---

[1] The exculpatory clause states, in relevant part: "IT IS UNDERSTOOD THAT ADT IS NOT AN INSURER, THAT INSURANCE, IF ANY, SHALL BE OBTAINED BY THE CUSTOMER AND THAT THE AMOUNTS PAYABLE TO ADT HEREUNDER ARE BASED UPON THE VALUE OF THE SERVICES IN THE SCOPE OF LIABILITY AS HEREIN SET FORTH ARE UNRELATED TO THE VALUE OF THE CUSTOMER'S PROPERTY OR PROPERTY OF OTHERS LOCATED IN CUSTOMER'S PREMISES. **CUSTOMER AGREES TO LOOK EXCLUSIVELY TO CUSTOMER'S INSURER TO RECOVER FOR INJURIES OR DAMAGES IN THE EVENT OF ANY LOSS OR INJURY AND RELEASES AND WAIVES ALL RIGHT OF RECOVERY AGAINST ADT RISING BY WAY OF SUBROGATION.** ADT MAKES NO GUARANTEE OR WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS, THAT THE SYSTEM OR SERVICES SUPPLIED, WILL AVERT OR PREVENT OCCURRENCES WITH THE CONSEQUENCES THEREFROM, WHICH THE SYSTEM OR SERVICE IS DESIGNED TO DETECT. IT IS IMPRACTICAL AND EXTREMELY DIFFICULT TO FIX THE ACTUAL DAMAGES, IF ANY, WHICH MAY PROXIMATELY RESULT FROM FAILURE ON THE PART OF ADT TO PERFORM ANY OF ITS OBLIGATIONS HEREUNDER. **CUSTOMER DOES NOT DESIRE THIS CONTRACT TO PROVIDE FOR FULL LIABILITY OF ADT AND AGREES THAT ADT SHALL BE EXEMPT FROM LIABILITY FOR LOSS, DAMAGE OR INJURY DUE DIRECTLY OR INDIRECTLY TO OCCURRENCES, OR CONSEQUENCES THEREFROM, WHICH THE SERVICE OR SYSTEM IS DESIGNED TO DETECT OR AVERT**; THAT IF ADT SHOULD BE FOUND LIABLE FOR LOSS, DAMAGE OR INJURY DUE TO A FAILURE OF SERVICE OR EQUIPMENT IN ANY RESPECT, ITS LIABILITY SHALL BE LIMITED TO A SUM EQUAL TO 10% OF THE ANNUAL SERVICE CHARGE OR $1000 WHICHEVER IS GREATER, AS THE AGREED UPON DAMAGES; AND THAT THE PROVISIONS OF THIS PARAGRAPH SHALL APPLY IF LOSS, DAMAGE OR INJURY, IRRESPECTIVE OF CAUSE OF ORIGIN, RESULTS DIRECTLY OR INDIRECTLY TO PERSON OR PROPERTY FROM PERFORMANCE OR

In addition, the contracts provided a merger clause, which stated the following:

> THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE CUSTOMER AND ADT.  CUSTOMER IS NOT RELYING ON ANY ADVICE OR ADVERTISEMENT OR ADT.  **CUSTOMER AGREES THAT ANY REPRESENTATION, PROMISE, CONDITION, INDUCEMENT OR WARRANTY, EXPRESS OR IMPLIED, NOT INCLUDED IN WRITING IN THIS AGREEMENT, SHALL NOT BE BINDING UPON ANY PART**, AND THAT THE TERMS AND CONDITIONS HEREOF APPLY AS PRINTED WITHOUT ALTERATION OR QUALIFICATION, EXCEPT AS SPECIFICALLY MODIFIED IN WRITING THE TERMS AND CONDITIONS OF THIS AGREEMENT SHALL GOVERN NOTWITHSTANDING ANY INCONSISTENT OR ADDITIONAL TERMS AND CONDITIONS OR ANY PURCHASE ORDER OR OTHER DOCUMENT SUBMITTED BY THE CUSTOMER.

[Id., p. 5] [emphasis added].

Plaintiff admits that he did not read either contract before signing.  [Plaintiff's Dep., Doc. 29-1, at 40:6-21].  He insists that he did not read the 2006 Contract because Mr. Flack was in a hurry.  [Id.].  Despite this contention, however, Plaintiff admits that Mr. Flack explained the general terms of the contract, namely, the services and equipment that ADT agreed to provide:

> We just discussed the amount of cameras I was getting and what package and, you know, how much cameras and how much motion sensors and stuff like that and door sensors, stuff like that, and what the deposit and down payment and stuff will be.

[Id.,at 40:17-21].  While Mr. Flack may have discussed the general terms, Plaintiff alleges that he was not aware of the exculpatory clause:

---

NONPERFORMANCE OF OBLIGATIONS IMPOSED BY THIS CONTRACT OR FROM NEGLIGENCE, ACTIVE OR OTHERWISE, STRICT LIABILITY, VIOLATION OF ANY APPLICABLE CONSUMER PROTECTION LAW, OR ANY OTHER ALLEGED FAULT ON THE PART OF ADT, ITS AGENTS OR EMPLOYEES . . ."  [Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, Doc. 29, at 4-5] [emphasis added].

Q.     Okay.   We'll get to that later.   But turning back to the contract, did Mr. Fla[ck] discuss any of these terms and conditions that are on the backside of the contract with you?

A.     No.

Q.     Did you read these terms and conditions?

A.     Well, he got the contract.  He got the paper and just gave me, I think, a receipt, and he took off with the paperwork after I give him, I think, the deposit.  I mean, he never sticks around long enough.  I mean, I have dealt three times with them, and three times or four times, I paid him.  He never stick around. After you hand him a check or hand him cash, he's gone.

Q.     So, let me get this straight.  He would meet with you?

A.     Yeah.

Q.     You would sign the contract:?

A.     Uh-huh (affirmative).

Q.     Would you read any part of the contract before you signed it?

A.     Well, he more or less just explained in a few details what's going around, what we order, and all that stuff.  That's about it.

Q.     So, you did not read the contract?

A.     I never get a chance to keep one of the contract, I mean.

Q.     Did you ask him for a copy of the contract?

A.     Well, he was supposed to.  He just give me a copy of the–whatever we ordered and a receipt for whatever I paid him.  That's it.

Q.     But did you ask him for a copy of the contract?

A.     No.

[Id., at 47:19-49:1].

On November 28, 2008, nearly two years after the alarm system was installed, Plaintiff's Store was burglarized. [Plaintiff's Complaint, Doc. 29-8, at 3, ¶ 11]. Plaintiff believes that thieves cut the land-line around midnight and then entered the Store. [Id.]. Because the land-line was cut, ADT was not signaled about the break-in. [Id.]. As Plaintiff explains, "the thieves cut the land-line connection to Defendant ADT prior to a forced entry through the front door of the establishment." [Id.]. Following the burglary on November 28, 2008, the parties executed a Rider for additional service. [Rider, Doc. 29-5]. Under the Rider, ADT agreed to provide a cellular back-up for $10.00 per month. [Id.].

According to Plaintiff, the thieves stole property worth over $70,000.00 and caused $30,000.00 in structural damage. [Id., at 3, ¶¶ 13-14]. In addition, Plaintiff alleges that he suffered over $15,000.00 in lost profits during the two days that the Store was closed for repairs. [Id., p. 4, ¶ 18]. As a basis for this lawsuit, Plaintiff argues that the Store would not have been burglarized–and therefore not have suffered property damage and loss–if ADT had a cellular back-up instead of a land-line. [Id.]. In support, Plaintiff alleges that on December 9, 2006–prior to signing the contract–he told Mr. Flack that he wanted a cellular back-up:

> Q.    So, in December of 2006, you talked about the cell back-up. Did you tell Mr. Flack that you wanted it?
>
> A.    Yes.
>
> Q.    And what did he tell you?
>
> A.    Well, everything was written and entered into the agreement based on my knowledge, and I guess I found out when the store was broken into there was not one.

Q.   You said everything was written into the contract.  But–

A.   Based on my knowledge, everything was written in there, based on my knowledge.

Q.   And why did you think that that was written into the contract?

A.   Because we agreed, and while I was talking, he was writing, okay.

Q.   So, Mr. Flack was writing on the contract?

A.   He was writing whatever.  He was making his note or writing whatever he was writing.  As we were talking, he was making notes just like you are now.

Q.   Okay.  He was making notes of everything that you wanted?

A.   Yes.  And everything that, you know, I mean, he was the sales guy, and he know what was best.  So, I mean, I was asking him questions as time go by.  And, you know, if –you know, if something I said didn't sound right, you know, I mean, I listen to him or take his opinion because based on my knowledge, he's the expert, not me.

Q.   And one of the things that you decided you wanted was the cell back-up?

A.   Yes.

Q.   And he [Mr. Flack] told you that he would get the cell back-up for you?

A.   Yes.

Q.   Do you think he intended to get the cell back-up for you?

A.   I think he was supposed to unless he really forgot or writ [sic] something down wrong.  I'm not sure.  I mean, I don't know what was going through his mind at that time.

Q.   Do you have any reason to believe that he told you he was going to get the cell back-up, but really he was lying, and he never intended to get that for you, or do you think it was just a mix up?

8

A.     Maybe it was just a mix up or somebody else mess up.  I don't know which one it is.

Q.     Besides that one conversation that you and Mr. Flack had regarding the cell back-up, did you have any other conversations with anyone at ADT before the first burglary regarding cell back-up?

A.     No.  We had the conversation about the cell phone back-up the day when he was writing the paperwork up and taking notes based on what I wanted, and we didn't have no conversation about the cell phone back-up until the first break-in.  I realized that there was no cell phone back-up, and Joe Flack came in on that day and give me a cell phone back-up for free, so he said.  And that's something I don't understand why would he come and install one with no cost to me.

. . .

Q.     Okay.  Just so I'm clear about this, you think that before you signed these two contracts here, you and Mr. Flack sat down, you talked about what you wanted?

A.     Uh-huh (affirmative).

Q.     You told him you wanted a cell back-up?

A.     Uh-huh (affirmative).

Q.     He told you he could get that for you.  You think somewhere along the way, Mr. Flack or someone else at ADT screwed up and you didn't get the cell back-up.  You didn't realize that or have any discussions with ADT about that until after the burglary, is that right?

A.     Yes.  I didn't realize that there was not one until after the burglary.

[Plaintiff's Dep., Doc. 29-1, at 134:8-137:20].  Plaintiff admits that at the time he signed the

contracts, Mr. Flack probably did not lie about the cellular back-up.  [Id., at 135:25-136:10].  Rather,

9

Plaintiff admits that Mr. Flack (or another ADT employee) probably just made an innocent mistake in failing to include the cellular back-up. [Id.].

Plaintiff does allege, however, that Mr. Flack tried to cover up his past mistake:

> Q.     When Mr. Flack told you that you had– that you were getting everything available, do you think he was lying to you at that time [when the contracts were signed in December 2006 and March 2007]?
>
> A.     At that time, no, I didn't think he was.
>
> Q.     Do you think he was lying to you at a later time [following the November 2008 burglary]?
>
> A.     Well, I think he was lying to cover up the fact that he did not install the cell phone back-up. That's why he give me that other one [the cellular back that was installed as part of the November 2008 Rider] for no, so he said, no cost to me.
>
> Q.     So, you think after the incidents, he maybe lied to you in an attempt to cover it up?
>
> A.     It's a possibility.

[Id., at 144:20-145:7]. In other words, Plaintiff does not allege that Mr. Flack lied about the cellular back-up at the time he signed the contracts. Rather, Plaintiff alleges that Mr. Flack lied about the cellular back-up to cover up his past mistake–that is, his failure to include the cellular back-up in the 2006 Contract.

Approximately one week after the burglary, a second incident occurred at Plaintiff's Store. [Plaintiff's Complaint, Doc. 29-8, at 4, ¶ 20]. During that incident, a truck rammed the front door of Plaintiff's Store. [Id.]. The driver did not enter the Store, and no property was stolen. [Plaintiff's Dep., Doc. 29-1, at 103:22-107:25]. However, Plaintiff had to close the Store for several weeks to repair the structural damage. [Plaintiff's Complaint, at 4, ¶ 21]. Plaintiff alleges that equipment

installed by ADT–including the "front door contacts" and "motion detectors"–failed during this incident. [Id., at 4, ¶¶ 24-5]. Based upon this incident, Plaintiff alleges that he suffered $50,000.00 in property damage, $4,000.00 in inventory loss, and $525,000.00 in lost profits during the thirty-five days that the Store was closed. [Id., at 4, ¶ 22]. Plaintiff alleges that if the security equipment had operated correctly, the police would have caught the perpetrator. [Plaintiff's Dep., Doc. 29-1, at 113:1-16].

On March 19, 2009, Plaintiff filed suit against ADT in the Circuit Court for Knox County, Tennessee. [Notice of Removal, Doc. 1]. On April 23, 2009, the case was removed to federal court. [Id.]. Plaintiff has sued ADT for claims of: (1) intentional misrepresentation; (2) fraudulent concealment; (3) fraudulent inducement; (4) negligent misrepresentation; (5) negligence; (6) breach of contract; and (7) violating the Tennessee Consumer Protection Act ("TCPA"), T.C.A. § 47-18-101 et seq. [Plaintiff's Complaint, Doc. 29-8]. In support of his claims, Plaintiff alleges that he was charged for equipment–the cellular back-up and a mounting bracket–that was not included in the contracts. [Id., at 3, ¶ 9]. In addition, Plaintiff alleges that if the cellular back-up had been installed, the Store would not have been burglarized:

> Q.    But I think you testified earlier, you're not for sure that you
>        paid ADT for the cell back-up?
>
> A.    No, I'm not one hundred percent sure. But I know I–it was
>        supposed to have been in the contract.
>
> Q.    It was supposed to be in the contract but it wasn't?
>
> A.    I guess not.
>
> Q.    Is it fair to say that that's something you didn't notice
>        because I think you testified earlier that you didn't read the
>        contract before you signed it?

> A.   No, I did not.  He [Mr. Flack] was making notes [during the meeting on December 9, 2006] off whatever we was talking about.

[Plaintiff's Dep., Doc. 29-1, at 139:20-140:6].

In response, ADT argues that it was not required to provide a cellular back-up because the contracts only provided for a land-line.  [Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, Doc. 29 at 7-9].  In addition, ADT argues that Plaintiff was not charged with the cellular back-up until after the November 2008 burglary.  In support, ADT provided an affidavit from John Gose, Operations Support Team Manager for ADT's Northeast Tennessee District, Southeast Region.  [John Gose's Affidavit, Doc. 29-2].  Mr. Gose states that he reviewed Plaintiff's ADT account, and learned that Plaintiff did not pay for a cellular back-up until after the November 2008 burglary.  [Id., at 1-2, ¶ 5].  In addition, ADT provided a copy of the Rider that the parties executed following the November 2008 burglary.  [Rider, Doc. 29-5].  Under the Rider, ADT agreed to provide a cellular back-up for $10.00 per month.  [Id.].  In addition, Mr. Gose states that Plaintiff was reimbursed for the mounting bracket on April 5, 2007, over a year prior to the November 2008 burglary.[2]  [Id.].

On June 14, 2010, ADT filed a Motion for Summary Judgment [Doc. 28], seeking to dismiss this lawsuit.  On July 6, 2010, Plaintiff filed a two-page response.  [Doc. 30].  In his response, Plaintiff references a "memorandum of law" filed in opposition to ADT's Motion for Summary

---

[2] On April 5, 2007, Plaintiff received a $100.87 credit to his account for the mounting bracket that was not installed.  [Rider for Mounting Bracket, Doc. 29-7].

Judgment.[3]  [Id.].  On January 12, 2011, the Court entered a "Show Cause" Order, directing Plaintiff

to file a memorandum of law by January 17, 2011.  [Doc. 31].  Plaintiff did not file a brief within

this time period.

## II.  STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate

when there is no genuine issue of material fact and the moving party is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56©.  The court must construe the facts and draw all inferences

therefrom in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co.

v. Zendith Radio Corp., 475 U.S. 574, 587 (1986).  A genuine issue of material fact exists if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue

of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also, e.g. Bridgeport Music,

Inc. v. WB Music Corp., 508 F.3d 394, 397 (6th Cir. 2007) ("The moving party bears the initial

burden of demonstrating the absence of any genuine issue of material fact, and all inferences should

be made in favor of the non-moving party.").  With regard to issues where the moving party will not

bear the ultimate burden of proof at trial, "the burden on the moving party may be discharged by

'showing' . . . that there is an absence of evidence to support the nonmoving party's case."  Celotex,

477 U.S. at 325.  The burden then shifts to the non-moving party to demonstrate the existence of

---

[3]  In his response, Plaintiff states, "[w]herefore, for the reasons expressed herein [the two-page response] and for those in the Plaintiff's Memorandum of Law [presumably a separate document], the Plaintiff respectfully asks this Honorable Court to deny the Defendant's Motion for Summary Judgment . . ."  [Plaintiff's Response in Opposition to ADT's Motion for Summary Judgment, Doc. 30].

genuine issues of material fact.  Id. at 324.  If the non-moving party fails to meet this burden, the moving party is entitled to summary judgment.

## III.    ANALYSIS

### A.    Introduction

As an initial matter, the Court notes that because it has "diversity" jurisdiction over this case, 28 U.S.C. § 1332, the law of the forum state–Tennessee–will govern the substantive issues.  *See, e.g.,* Biegas v. Quickway Carriers, Inc., 573 F.3d 365, 374 (6th Cir. 2009) ("Under the Erie doctrine, federal courts sitting in diversity apply the substantive law of the forum state and federal procedural law.") (citing Erie R. Co. v. Tompkins, 304 U.S. 64 (1938)).

When Plaintiff signed the contracts, he agreed to allocate any  risk of property damage or loss to his insurance company.  [Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, Doc. 29, at 4-5].  As the Tennessee Court of Appeals has stated, "such clauses must be interpreted and enforced according to their plain terms."  Ouzts v. Womack, 160 S.W.3d 883, 885 (Tenn. Ct. App. 2004) (citation omitted).  Based upon the clear language of the contracts, Plaintiff agreed to exculpate ADT for any property damage or loss, regardless of the theory of liability.  [Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, Doc. 29, at 4-5].

As a general rule, Tennessee courts recognize that "exculpatory clauses are valid in Tennessee and are not against the public policy of the state."  Burks v. Belz-Wilson Props., 958 S.W.2d 773, 776 (Tenn. Ct. App. 1997).  In Houghland v. Sec. Alarms & Servs., Inc., the Tennessee Supreme Court upheld the use of exculpatory clauses in the alarm services industry.  755 S.W.2d 769, 773 (Tenn. 1988) ("Limitations against liability for negligence or breach of contract have

generally been upheld in this state in the absence of fraud or overreaching.") (citations omitted).  In Houghland, the plaintiffs sued an alarm system company after their home was burglarized.  Id. at 771.  Prior to the burglary, the plaintiffs signed a contract with Security Alarms and Services, Inc. ("Security Alarms").  Id.  Under the contract, Security Alarms agreed to provide an alarm system for the plaintiffs' home.  Id.  After their home was burglarized, the plaintiffs–like the Plaintiff in the present case–sued the alarms systems company for negligent misrepresentation, breach of contract, intentional misrepresentation, negligence, and a claim under the TCPA.  Id.

The Tennessee Supreme Court upheld the validity of the contract, finding that the plaintiffs "expressly and unconditionally released Security Alarms from all hazards which were covered by insurance."  Id.  However, before it reached that result, the court analyzed whether there was evidence of fraud or negligent misrepresentation.  Id. at 773.  As the court stated, "[i]n the absence of that kind of tortious conduct, in our opinion, the parties are bound by the contractual provisions contained in the . . . agreement."  Id.  This analysis–determining whether there is fraud or negligent misrepresentations–is an essential step in determining whether to uphold an exculpatory clause.

One court has explained the policy reasons for upholding exculpatory clauses as follows:

> The essential rationale of cases upholding the validity of such exculpatory clauses is that a property owner generally will maintain insurance coverage on its property, especially if it is valuable, and that the property owner is in a far better position than the alarm system seller to know the property's value and to bargain with an insurance company for appropriate coverage and an appropriate premium[.]  Thus, the practical effect of an exculpatory clause in a contract for the sale of an alarm system is to foreclose an insurance company that has paid the owner for the loss from maintaining a subrogation action against the seller of the alarm system.  The ADT form contract expressly recognizes this purpose of the exculpatory clause, by providing that '[c]ustomer agrees to look exclusively to customer's insurer to recover for injuries or damage in the event of

> any loss or injury and releases and waives all right of recovery
> against ADT arising by way of subrogation.'

Synnex Corp. v. ADT Sec. Servs., Inc., 394 N.J. Super. 577, 589 (N.J. Super. Ct. App. Div. 2007)

(citation and quotations omitted).  While these clauses are generally enforceable, they will not be

upheld if they violate the public policy of Tennessee– that is, if there is *"fraud, misrepresentation*

*or violations of the Tennessee Consumer Protection Act*."  Gross v. McKenna, No. E2005-02488-

COA-R3-CV, 2007 WL 3171155, at *6 (Tenn. Ct. App. Oct. 30, 2007) (emphasis added) (citing

Underwood v. Nat'l Alarm Servs., Inc., No. E2006-00107-COA-R3-CV, 2007 WL 1412040, at *5

(Tenn. Ct. App. May 14, 2007)).  *See also* In re Sikes, 184 B.R. 742, 746 (Bankr. M.D. Tenn. 1995)

("Tennessee, like most jurisdictions, does not permit disclaimers of liability or exculpatory clauses

to excuse a party from fraud.") (citation omitted); First Nat'l Bank of Louisville v. Brooks Farms,

821 S.W.2d 925, 929 (Tenn. 1991) ("[T]he law does not permit a covenant of immunity to be drawn

that will protect a person against his own fraud; such a covenant is unenforceable because of public

policy.").  In Underwood, the Tennessee Court of Appeals upheld an exculpatory clause in an alarms

services agreement because there was no evidence of fraud or misrepresentation:

> In the case at bar, Ms. Underwood signed a contract with language
> that bears a remarkable likeness to the contract at issue in Houghland.
> By signing the contract, Ms. Underwood acknowledged that National
> Alarm [the alarms services provider] was not an insurer of property.
> The contract also provided that, in the event National Alarm was held
> liable for any loss relating to the provision of alarm services under
> the terms of the contract, then National Alarm's liability would be
> limited to $250.  The contract further stated that the sum was
> liquidated damages, not a penalty, and that the remedy was exclusive.
> Ms. Underwood had the opportunity to pay an additional fee for
> National Alarm to assume greater liability than the $250 limit
> established by the contract; however, she opted not to incur the extra
> expense.

> Ms. Underwood has not alleged any fraud or intentional misrepresentation that might provide this Court with justification for voiding the contract or any portion thereof. Although this may be a harsh result, given the substantial damages sustained by Ms. Underwood and her family in the house fire, we are bound by precedent to enforce the liquidated damages clause that was signed by Ms. Underwood and a National Alarm representative.

2007 WL 1412040, at *6 (citing Houghland, 755 S.W.2d at 771). As the court further explained in Underwood, "[c]onsistent with the parties' freedom to construct their own bargain, they are free to allocate liability for future damages, provided that such clauses do not violate public policy." 2007 WL 1412040, at *5 (citing Planters Gin Co. v. Fed. Compress & Warehouse Co., 78 S.W.3d 885, 892 (Tenn. 2002)).

First, the Court must determine whether the exculpatory clause violates the public policy of Tennessee. To answer this question, the Court must determine whether there is a genuine issue of material fact regarding Plaintiff's claims for intentional misrepresentation, fraudulent concealment, fraudulent inducement, negligent misrepresentation, and TCPA violations. *See* Gross, 2007 WL 3171155, at *6 (recognizing that exculpatory clauses are void if there is "fraud, misrepresentation or violations of the Tennessee Consumer Protection Act"). If Plaintiff failed to raise a genuine issue of material fact regarding *any* of these claims, then Plaintiff's remaining claims of negligence and breach of contract are barred by the exculpatory clause. *See* Houghland, 755 S.W.2d at 773 (recognizing that "[l]imitations against liability for *negligence or breach of contract* have generally been upheld in this state" absent evidence of fraud or other violations of public policy) (emphasis added) (citations omitted).

**B.    Plaintiff Failed to Raise a Genuine Issue of Material Fact Regarding His Fraud Claims**

**1. Plaintiff Failed to Raise a Genuine Issue of Material Fact Regarding His Intentional Misrepresentation Claim**

In Tennessee, there are a variety of claims that fall under the umbrella of "fraud." This includes a claim for "intentional misrepresentation," which requires a plaintiff to show that "(1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation." Walker v. Sunrise Pontiac-GMC Truck, Inc., 249 S.W.3d 301, 311 (Tenn. 2008) (citation omitted).

Plaintiff's intentional misrepresentation claim fails for two reasons. First, Plaintiff failed to provide evidence that Mr. Flack intentionally sought to deprive Plaintiff of the cellular back-up. At most, the record shows that Mr. Flack may have accidentally failed to include the cellular back-up in the 2006 Contract:

> Q. And one of the things that you decided you wanted was the cell back-up?
>
> A. Yes.
>
> Q. And he [Mr. Flack] told you that he would get the cell back-up for you?
>
> A. Yes.
>
> Q. Do you think he intended to get the cell back-up for you?
>
> A. I think he was supposed to unless he really forgot or writ [sic] something down wrong. I'm not sure. I mean, I don't know what was going through his mind at that time.
>
> Q. Do you have any reason to believe that he told you he was

going to get the cell back-up, but really he was lying, and he
never intended to get that for you, or do you think it was just
a mix up?

A.   **Maybe it was just a mix up or somebody else mess up.  I
     don't know which one it is.**

[Plaintiff's Dep., Doc. 29-1, at 135:13-136:5] [emphasis added].  Plaintiff's own testimony shows

that ADT representatives did not intentionally deceive him.  In addition, Plaintiff's testimony shows

that ADT representatives did not recklessly make representations– that is, with "a carelessness as

to whether the facts are true or false or without belief in their truth."  Menuskin v. Williams, 145

F.3d 755, 764 (6th Cir. 1998) (citing Tartera v. Palumbo, 453 S.W.2d 780, 782 (Tenn. 1970)).  At

most, the evidence shows that the failure to include the cellular back-up was probably the result of

an innocent mistake.  Plaintiff has done nothing to rebut this.

In his response to ADT's Motion for Summary Judgment [Doc. 30], Plaintiff asserts that

ADT representatives engaged in "fraudulent means."   However, like the rest of his response,

Plaintiff provides no evidentiary support.   Instead, Plaintiff relies entirely upon conclusory

allegations.  This, of course, is not enough to survive a motion for summary judgment.  After ADT

demonstrated an absence of a genuine issue of material fact regarding Plaintiff's intentional

misrepresentation claim–namely, that ADT representatives did not intentionally or recklessly make

statements about the cellular back-up being included in the 2006 Contract–the burden shifted to

Plaintiff to raise a genuine issue of material fact.  *See* Celotex, 477 U.S. at 324.  In response,

Plaintiff  failed to provide affidavits or other documents raising a genuine issue for trial.  Fed. R.

Civ. P. 56(c)(4).  The conclusory allegations in Plaintiff's Response [Doc. 30] are insufficient to

satisfy his burden.

Plaintiff's claim also fails for a second reason: he did not reasonably rely upon the alleged misrepresentations. In order to establish an intentional misrepresentation claim, the plaintiff must show that he "reasonably relied on the misrepresented material fact." Walker, 249 S.W.3d at 311. As the Tennessee Court of Appeals has stated, "[a]lthough contracting parties have a duty to disclose material facts affecting the essence of a contract's subject matter, *a party does not have a duty to disclose a material fact where ordinary diligence would have revealed the undisclosed fact*." Odom v. Oliver, 310 S.W.3d 344, 349-50 (Tenn. Ct. App. 2009) (emphasis added). Consequently, "[a] party cannot be permitted to claim that he has been taken advantage of if he had the means of acquiring the needed information or if, because of his business experience or his prior dealings with the other party, he should have acquired further information before he acted." Id. at 350 (quoting Macon Cnty. Livestock Mkt., Inc. v. Ky. State Bank, Inc., 724 S.W.2d 343, 351 (Tenn. Ct. App. 1986)). *See also* Lonning v. Jim Walter Homes, Inc., 725 S.W.2d 682, 685 (Tenn. Ct. App. 1986) ("A party to a contract has a duty to disclose to the other party any material fact affecting the essence of the subject matter of the contract, unless ordinary diligence would have revealed the undisclosed fact.") (citing Simmons v. Evans, 206 S.W.2d 295, 296 (Tenn. 1947)).

When a person signs a contract in Tennessee, that person is presumed to have read its contents. *See. e.g.,* Beasley v. Metro. Life Ins. Co., 229 S.W.2d 146, 148 (Tenn. 1950) ("[T]hat if, without being the victim of fraud [the insured] fails to read the contract or otherwise to learn its contents, he signs the same at his peril and is estopped to deny his obligation, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence."). *See also* Robert J. Denley Co., Inc. v. Neal Smith Constr. Co., Inc., No. W2006-00629-COA-R3-CV, 2007 WL 1153121, at *6 (Tenn. Ct. App. Apr. 19, 2007) ("There is no duty

to disclose a material fact if it was apartment through 'common observation' or if it would have been discoverable through the exercise of ordinary diligence.") (citations omitted).

There is no question that it was apparent through "common observation" and "ordinary diligence" that the cellular back-up was not included in the 2006 Contract. To learn this fact, all Plaintiff had to do was read the contract. Instead, Plaintiff ignored the clear language of the contract, which provided that ADT was only required to install the equipment expressly listed in the contract:

> Customer acknowledges that: (a) ADT has explained the full range of protection, equipment, and services available to Customer; (b) additional protection over and above that provided herein is available and may be obtained from ADT at an additional cost to the Customer; and (c) **Customer desires and has contracted for only the equipment and services itemized on this Agreement.**

[Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, Doc. 29, at 4] [emphasis added]. Notably, the Contracts did not provide for a cellular-back-up. [*See* Doc. 29-3 and Doc. 29-4].

Plaintiff had both the means to learn that the cellular back-up was not included in the 2006 Contract, and the business experience[4]. Instead, Plaintiff chose not to read the contracts before signing them. [Plaintiff's Dep., Doc. 29-1, at 47:19-49:1]. As the Tennessee Court of Appeals has stated, "[g]enerally, a party dealing on equal terms with another is not justified in relying upon representations where the means of knowledge are readily within his reach." Solomon v. First Nat'l Bank of Nashville, 774 S.W.3d 935, 943 (Tenn. Ct. App. 1989) (citation omitted) (finding that there

---

[4] In addition to owning and managing the convenience store and gas station, the "Spring Hill Market," Plaintiff owns a proprietorship known as the "East Tennessee Scrap." [Plaintiff's Dep., Doc. 29-1, at 12:2-15:25]. Plaintiff is responsible for managing twenty to thirty employees at East Tennessee Scrap, which is involved in the transportation of scrap metal. [Id.].

was no actionable fraud when the plaintiff chose not to read the guaranty agreement, and instead relied upon oral representations). Plaintiff's intentional misrepresentation claim fails because he did not reasonably rely upon Mr. Flack's alleged misrepresentations. In other words, when Plaintiff chose not to read the contract, he failed to exercise ordinary diligence. Accordingly, Plaintiff's intentional misrepresentation claim is **DISMISSED WITH PREJUDICE.**

**2.    Plaintiff Failed to Raise a Genuine Issue of Material Fact Regarding His Fraudulent Concealment Claim**

The tort of "fraudulent concealment" is another claim that falls under the umbrella of "fraud." This tort, also known as "constructive fraud," is committed when "a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." Odom, 310 S.W.3d at 349 (citing Chrisman v. Hill Home Dev., Inc., 978 S.W.2d 535, 538-39 (Tenn. 1998)). *See also* Kincaid v. SouthTrust Bank, 221 S.W.3d 32, 39-40 (Tenn. Ct. App. 2006) ("Constructive fraud is a breach of a legal or equitable duty which is deemed fraudulent because of its tendency to deceive others . . . [n]either actual dishonesty or purpose nor intent to deceive is an essential element of constructive fraud."). As the courts have recognized, "knowledge" is an essential element of the tort. *See* Odom, 310 S.W.3d at 349 ("For the nondisclosure to constitute fraud, the charged party must have knowledge of an existing fact or condition and a duty to disclose that fact or condition.") (citation omitted). In addition, the fact must be "material" to the transaction. Id. For example, in the context of a house sale, "the buyer must show, among other things, that the seller had knowledge of the defective condition." Stanfill v. Mountain, 301 S.W.3d 179, 185 (Tenn. 2009) (citing Chrisman, 978 S.W.2d at 539).

In support of his fraudulent concealment claim, Plaintiff alleges that Mr. Flack did not disclose material facts about the 2006 Contract, namely, that the contract did not provide for a cellular back-up. [Plaintiff's Complaint, Doc. 29-8, at 5-6, ¶¶ 34-37]. In support, Plaintiff alleges the following:

> Defendant intentionally concealed and/or intentionally failed to disclose all material facts of the transaction to Plaintiff. To wit: Failing to inform the Plaintiff that he did not have everything installed that he was paying for.

[Id., p. 6, ¶ 36]. Plaintiff's claim fails for two reasons.

First, as demonstrated by Plaintiff's testimony, ADT's failure to include the cellular back-up was probably the result of an innocent mistake. [Plaintiff's Dep., Doc. 29-1, at 135:13-136:5]. Plaintiff has not provided any evidence to rebut this. Because the evidence at most shows an innocent mistake, ADT has demonstrated an absence of a genuine issue of material fact regarding ADT's knowledge and intent. After ADT demonstrated an absence of a genuine issue of material fact regarding their knowledge and intent, the burden shifted to Plaintiff to raise a genuine issue of material fact. *See* Celotex, 477 U.S. at 324. In response, Plaintiff failed to provide affidavits or other documents raising a genuine issue for trial. Fed. R. Civ. P. 56(c)(4). The conclusory allegations in Plaintiff's Response [Doc. 30] are insufficient to satisfy his burden.

Second, Plaintiff did not reasonably rely upon ADT's alleged nondisclosure. As the Tennessee Court of Appeals recently affirmed, "[a]lthough contracting parties have a duty to disclose material facts affecting the essence of a contract's subject matter, a party does not have a duty to disclose a material fact where ordinary diligence would have revealed the undisclosed fact." Odom, 310 S.W.3d at 349-50 (citation omitted). The Court previously found–in the context of

Plaintiff's intentional misrepresentation claim–that he did not exercise reasonable reliance. *See* Part III.B.1. For those same reasons, the Court finds that Plaintiff did not reasonably rely upon ADT's alleged nondisclosure. In particular, the Court finds that Plaintiff had both the means to learn about the cellular back-up, and the business experience. Id. *See also* Macon Cnty. Livestock Mkt., Inc., 724 S.W.3d at 351 ("A party cannot be permitted to claim that he has been taken advantage of if he had the means of acquiring the needed information or if, because of his business experience or his prior dealings with the other party, he should have acquired further information before he acted."). In other words, when Plaintiff chose not to read the contract, he failed to exercise ordinary diligence. Accordingly, Plaintiff's fraudulent concealment claim is **DISMISSED WITH PREJUDICE**.

### 3. Plaintiff Failed to Raise a Genuine Issue of Material Fact Regarding His Fraudulent Inducement Claim

In support of his third "fraud" claim, Plaintiff alleges that ADT fraudulently induced him to sign the 2006 Contract. This tort, also known as "promissory fraud," is "perpetrated by means of a false promise of future action." Shahrdar v. Global Hous., Inc., 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998). To prevail on a claim of promissory fraud, the plaintiff must establish "(1) an intentional misrepresentation of a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) an injury caused by reasonable reliance on the statement; and (4) a promise of future action with no present intent to perform." Houghland v. Houghland, No. M2005-01770-COA-R3-CV, 2006 WL 2080078, at *3 (Tenn. Ct. App. July 26, 2006) (citations omitted). This is similar to a claim for intentional misrepresentation, except it requires an additional element: the defendant must make a forward-looking promise with no intent to perform the future act. *See* id.; *see also* Hood Land Trust v. Hastings, No. M2009-02625-COA-R3-CV, 2010 WL

3928647, at *7 (Tenn. Ct. App. Oct. 5, 2010) (recognizing that fraudulent inducement is a "form" of intentional misrepresentation). Plaintiff's claim fails for two reasons.

First, Plaintiff has not shown that ADT representatives intentionally misrepresented the status of the cellular back-up. The Court previously found–in the context of the intentional misrepresentation claim–that ADT representatives did not make intentional or reckless statements about the cellular-back being included in the 2006 Contract. *See* Part III.B.1. In particular, Plaintiff's own testimony shows that ADT representatives did not intentionally deceive him. [Plaintiff's Dep., Doc. 29-1, at 135:13-136:5]. At most, the evidence–which includes Plaintiff's testimony–shows that the failure to include the cellular back-up was probably the result of an innocent mistake. After ADT demonstrated an absence of a genuine issue of material fact regarding Plaintiff's fraudulent inducement claim–namely, that ADT representatives did not intentionally make statements about the cellular back-up being included in the 2006 Contract–the burden shifted to Plaintiff to raise a genuine issue of material fact. *See* Celotex, 477 U.S. at 324. In response, Plaintiff failed to provide affidavits or other documents raising a genuine issue for trial. Fed. R. Civ. P. 56(c)(4). The conclusory allegations in Plaintiff's Response [Doc. 30] are insufficient to satisfy his burden.

Second, Plaintiff did not reasonably rely upon Mr. Flack' alleged misrepresentations. An essential element of any fraud claim is reasonable reliance by the plaintiff. As the Tennessee Court of Appeals explained in Houghland:

> The tort of fraud requires proof of a successful deception and action taken by the person deceived that would not have otherwise been taken. For a party to be deceived, it must have reasonably relied on a false statement.

2006 WL 2080078, at *4 (citation omitted). In the context of Plaintiff's intentional misrepresentation claim, the Court previously found that Plaintiff did not exercise reasonable reliance. *See* Part III.B.1. For those same reasons, the Court finds that Plaintiff did not show reasonable reliance in the context of his fraudulent inducement claim, which is based upon the same alleged misrepresentations. In particular, the Court finds that Plaintiff had both the means to learn about the cellular back-up, and the business experience. When Plaintiff chose not to read the contracts, he did not exercise ordinary diligence. Accordingly, because Plaintiff failed to show reasonable reliance, Plaintiff's fraudulent inducement claim is **DISMISSED WITH PREJUDICE**.

### C. Plaintiff Failed to Raise a Genuine Issue of Material Fact Regarding His Negligent Misrepresentation Claim

To establish a claim of negligent misrepresentation, the plaintiff must prove that "(1) the defendant supplied information to the plaintiff; (2) the information was false; (3) the defendant did not exercise reasonable care in obtaining or communicating the information; and (4) the plaintiffs justifiably relied on the information. <u>Walker</u>, 249 S.W.3d at 311 (quoting <u>Williams v. Berube & Assocs.</u>, 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000)). In the context of business transactions, the plaintiff must establish the following elements:

> (1)    the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and
>
> (2)    the defendant supplies false information meant to guide others in their business transaction; and
>
> (3)    the defendant fails to exercise reasonable care in obtaining or communicating the information; and
>
> (4)    the plaintiff justifiably relies upon the information.

John Martin Co. v. Morse/Diesel, Inc., 819 S.W.2d 428, 431 (Tenn. 1991) (citation omitted). In addition, the false information must "consist of a statement of a material past or present fact." McElroy v. Bois Cascade Corp., 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982). Consequently, "statements of opinion or intention are not actionable," and "representations concerning future events are not actionable even though they may later prove to be false." Id. (citations omitted).

The difference between claims for negligent misrepresentation and intentional misrepresentation (also known as "fraud") is that "[w]ith intentional misrepresentation, it must be established that the defendant made a misrepresentation with knowledge of its falsity or without regard to its truth or falsity." Regions Bank v. Lost Cove Cabins & Campgrounds, Inc., No. M2009-02389-COA-R3-CV, 2010 WL 4514957, at *7 ((Tenn. Ct. App. Nov. 9, 2010) (citing Shahrdar, 983 S.W.2d at 237). As with claims of intentional misrepresentation, "[j]ustifiable reliance also is a necessary element in a cause of action based upon negligent or fraudulent misrepresentation." Homestead Group, LLC v. Bank of Tenn., 307 S.W.3d 746, 752 (Tenn. Ct. App. 2009) (citation omitted). See also Williams, 26 S.W.3d at 645 ("An essential element of any action for fraud, deceit, failure to disclose or negligent or innocent misrepresentations is detrimental reliance on a false promise.") (citations omitted).

In support of his negligent misrepresentation claim, Plaintiff alleges that Mr. Flack "made certain representations to the Plaintiff regarding the type of security system he was receiving and the subsequent amounts of monies he was paying for said services and equipment[.]" [Plaintiff's Complaint, Doc. 29-8, at 6-7, ¶ 38]. In particular, Plaintiff alleges the following:

> The statements were material misrepresentations made by the Defendant who both had a duty to properly inform the Plaintiff as to these material facts, i.e. that the Plaintiff was paying for the top of the

line security system, and he actually had what amounted to a series
of fancy electrical equipment, cameras, and sensors, that simply were
not what they appeared to be, and did not function at all.

The Plaintiff justifiably and detrimentally relied upon any and all of
the material misrepresentations made to him by the Defendant, and
that this was based on a false premise.

[Id., p. 7, ¶¶ 39-40].  Plaintiff's claim fails for two reasons.

First, ADT has provided evidence showing that Plaintiff was not charged with the cellular

back-up until after the November 2008 burglary.  In support, ADT provided an affidavit from John

Gose, Operations Support Team Manager for ADT's Northeast Tennessee District, Southeast

Region.  [John Gose's Affidavit, Doc. 29-2].  Mr. Gose states that he reviewed Plaintiff's ADT

account, and learned that Plaintiff did not pay for a cellular back-up until after the November 2008

burglary.  [Id., at 1-2, ¶ 5].  In addition, ADT provided a copy of the Rider that the parties executed

following the November 2008 burglary.  [Rider, Doc. 29-5].  Under the Rider, ADT agreed to

provide a cellular back-up for $10.00 per month.  [Id.].  Plaintiff has not provided any evidence

showing that he was charged for the cellular back-up prior to the November 2008 burglary.

Second, Plaintiff has not shown that he reasonably relied upon Mr. Flack's alleged

misrepresentations.  The Court previously determined–in the context of Plaintiff's fraud claims–that

he did not raise a genuine issue of material fact regarding whether he reasonably relied upon ADT's

alleged misrepresentations and nondisclosure.  *See* Parts III.B.1-3.  For those same reasons, the

Court finds that Plaintiff has not raised a genuine issue regarding whether he reasonably relied upon

ADT's alleged negligent misrepresentations regarding the cellular back-up.  In particular, the Court

finds that ADT demonstrated an absence of a genuine issue of material fact when it proved that

Plaintiff–an experienced businessman–had the opportunity to read the 2006 Contract, but chose not

to. As the Tennessee Court of Appeals has stated, "[o]rdinarily, one having the ability and opportunity to inform himself of the contents of a writing before he executes it will not be allowed to avoid it by showing that he was ignorant of its contents or that he failed to read it." Solomon, 774 S.W.2d at 943 (citation omitted). It was within Plaintiff's "ordinary diligence" to learn that the 2006 Contract did not provide for a cellular back-up. Plaintiff simply chose not to.

After ADT demonstrated an absence of a genuine issue of material fact regarding Plaintiff's negligent misrepresentation claim, the burden shifted to Plaintiff to raise a genuine issue of material fact. *See* Celotex, 477 U.S. at 324. In response, Plaintiff failed to provide affidavits or other documents raising a genuine issue for trial. Fed. R. Civ. P. 56(c)(4). The conclusory allegations in Plaintiff's Response [Doc. 30] are insufficient to satisfy his burden. Accordingly, Plaintiff's negligent misrepresentation claim is **DISMISSED WITH PREJUDICE**.

D.    **Plaintiff Failed to Raise a Genuine Issue of Material Fact Regarding His TCPA Claim**

In 1977, the Tennessee legislature enacted the TCPA to protect consumers from "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." T.C.A. § 47-18-104(a). *See also* Tucker v. Sierra Builders, 180 S.W.3d 109, 114-15 (Tenn. Ct. App. 2005) (providing a summary of the TCPA's history and purpose). While the TCPA lists specific acts or practices that constitute violations, *see* T.C.A. § 47-18-104(b), those acts are not exclusive. *See* T.C.A. § 47-18-104(a) (recognizing the general prohibition against "unfair or deceptive acts or practices"). In fact, the TPCA "does not impose a single standard applicable to all cases for determining whether a particular act or practice is deceptive for the purpose of Tenn. Code. Ann. § 47-18-104(b)(27)." Fayne v. Vincent, 301 S.W.3d 162, 177 (Tenn. 2009). In addition, these

concepts–"unfairness" and "deceptiveness"–are independent grounds for violating the TCPA. *See* Tucker, 180 S.W.3d at 116 ("The concept of unfairness is even broader than the concept of deceptiveness, and it applies to various abusive business practices that are not necessarily deceptive.") (citation omitted).

To enforce these provisions, the TCPA created a private right of action:

> Any person who suffers an as ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages

T.C.A. § 47-18-109(a)(1). For the Act to apply, "the unfair or deceptive acts must affect trade or commerce, as defined by the Act." Davenport v. Bates, No. M2005-02052-COA-R3-CV, 2006 WL 3627875, at *17 (Tenn. Ct. App. Dec. 12, 2006). The terms "trade" and "commerce" are defined as "the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things wherever situated." T.C.A. § 47-18-103(9). In this case, Plaintiff's TCPA claim is based upon services and goods provided by ADT.

In order to recover under the TCPA, the plaintiff must prove "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article or commodity, or thing of value wherever situated . . .'" Tucker, 180 S.W.3d at 115 (citing T.C.A. § 47-18-109(a)(1)). An act is "deceptive" if it involves a "material representation, practice or omission likely to mislead a reasonable consumer." Davis v. McGuigan, 325 S.W.3d 149, 162

(Tenn. 2010) (quoting Ganzevoort v. Russell, 949 S.W.2d 293, 299 (Tenn. 1997)).  In contrast, an act is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."  Davis, 325 S.W.3d at 162 (quoting Tucker, 180 S.W.3d at 116-17).

Plaintiff does not allege that ADT engaged in any specific act or practice declared unlawful in T.C.A. § 47-18-104(b).  Consequently, Plaintiff must prove that he suffered an "ascertainable loss of money or property," T.C.A. § 47-18-109(a)(1), as a result of ADT's "unfair or deceptive acts or practices," T.C.A. § 47-18-104(a) (the Act's catchall provision).  See Davis, 325 S.W.3d at 161-62 (explaining that because the plaintiff did not allege a specific violation under the TCPA,  the plaintiff must show that he suffered "an ascertainable loss of money or property" under the catchall provision).

Because the TCPA is remedial by its very nature, the Court must liberally construe Plaintiff's claims.  See, e.g., Bennett v. Visa U.S.A. Inc., 198 S.W.3d 747, 753 (Tenn. Ct. App. 2006); T.C.A. § 47-18-102(2) (requiring that the Act "be liberally construed" to protect "consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state").  Consequently, the TCPA's scope is much broader than common-law fraud:

> The TCPA was not intended to be a codification of the common law. To the contrary, one of the express purposes of the TCPA is to provide additional, supplementary state law remedies to consumers victimized by unfair or deceptive business acts or practices that were committed in Tennessee in whole or in part.  Moreover, the TCPA is explicitly remedial, and Tennessee courts are therefore required to construe it liberally to protect consumers in Tennessee and elsewhere.
>
> The scope of the TCPA is much broader than that of common-law

fraud. Under the TCPA, a consumer can obtain recovery without
having to meet the burden of proof that is required in common-law
fraud cases, and the numerous defenses that are available to the
defendant in a common-law fraud case are simply not available to the
defendant in a TCPA case. Misrepresentations that would not be
actionable as common-law fraud may nevertheless be actionable
under the provisions of the little FTC acts, including the TCPA.
Claims under the TCPA are not limited to misrepresentations that are
fraudulent or willful. Instead, the TCPA applies to any act or practice
that is unfair or deceptive to consumers.

Tucker, 180 S.W.3d at 115 (citations omitted). In support of his claim, Plaintiff alleges that

"Defendant willfully engaged in unfair and deceptive trade practices by contracting with the Plaintiff

and charging the Plaintiff for services and equipment that were never received or installed."

[Plaintiff's Complaint, Doc. 29-8, at 5, ¶ 30.]. Plaintiff's claim fails for two reasons.

First, ADT has provided evidence showing that it did not engage in unfair or deceptive acts,

namely, that it did not charge Plaintiff for the cellular back-up until after the November 2008

burglary. In support, ADT has provided an affidavit from John Gose, Operations Support Team

Manager for ADT's Northeast Tennessee District, Southeast Region. [John Gose's Affidavit, Doc.

29-2]. Mr. Gose states that he reviewed Plaintiff's ADT account, and learned that Plaintiff did not

pay for a cellular back-up until after the November 2008 burglary. [Id., at 1-2, ¶ 5]. In addition,

ADT has provided a copy of the Rider that the parties executed following the November 2008

burglary. [Rider, Doc. 29-5]. Under the Rider, ADT agreed to provide a cellular back-up for $10.00

per month. [Id.]. Plaintiff has not provided any evidence showing that he was charged for the

cellular back-up prior to the November 2008 burglary.

After ADT demonstrated an absence of a genuine issue of material fact regarding Plaintiff's

TCPA claim–that ADT did not commit an unfair or deceptive act–the burden shifted to Plaintiff to

raise a genuine issue of material fact.  *See* Celotex, 477 U.S. at 324.  In response, Plaintiff  failed

to provide affidavits or other documents raising a genuine issue for trial.  Fed. R. Civ. P. 56(c)(4).

Notably, Plaintiff failed to provide any evidence showing that he was charged with the cellular back-

up prior to the November 2008 burglary.  Simply put, the conclusory allegations in Plaintiff's

Response [Doc. 30] are insufficient to satisfy his burden.

Second, Plaintiff's claim fails because the alleged injury was "*reasonably avoidable by [the]*

*consumer[] . . .*"  Tucker, 108 S.W.3d at 117 (emphasis added).  As the court explained in Tucker:

> Consumers cannot reasonably avoid injury when a merchant's sales
> practices unreasonably create or take advantage of an obstacle to the
> free exercise of consumer decision-making.   Practices that
> unreasonably interfere with consumer decision-making include (1)
> withholding important information from consumers; (2) overt
> coercion, or (3) exercising undue influence over a highly susceptible
> class of consumers.

180 S.W.3d at 117 (citation omitted).  *See also* Fleming v. Murphy, No. W2006-00701-COA-R3-

CV, 2007 WL 2050930, at *11 (Tenn. Ct. App. July 19, 2007) (affirming summary judgment in

favor of the defendant on the TCPA claims because the plaintiff's injury was "reasonably

avoidable").   As the following case makes clear, Plaintiff's alleged injury was "reasonably

avoidable."

In Burkhart v. Wells Fargo Bank W., N.A., the plaintiff sued Wells Fargo and its trustee

under the TCPA for misrepresentations made in connection with the purchase of real property.  No.

E2006-01402-COA-R3-CV, 2007 WL 1836850, at *1 (Tenn. Ct. App. Jun. 27, 2007).  In June 2003,

the plaintiff purchased property at a foreclosure sale known as "Parcel 17" and "Parcel 22"

(collectively, the "Parcels").  Id.  Prior to the foreclosure sale, the Parcels were owned by Mr. Terry

Thomas.  Id.  Before the property was transferred to the plaintiff, Mr. Thomas executed a Deed of

Trust on Parcel 17 (the "First Trust Deed"). Id. Under the First Trust Deed, Mr. Thomas owed a debt to a mortgage company. Id. Eventually, Wells Fargo became the holder of the First Trust Deed. Id.

Mr. Thomas also executed a second Deed of Trust ("Second Trust Deed") prior to the foreclosure sale. Id. Under the Second Trust Deed, Mr. Thomas owed a debt to Wells Fargo. Id. In 2003, the trustee of Wells Fargo published a notice of foreclosure on the Second Trust Deed. Id. The notice made clear that the foreclosure was subject to prior liens and encumbrances. Id. In June 2003, the plaintiff purchased the Parcels during the foreclosure sale of the Second Trust Deed. Id. During the foreclosure sale, the plaintiff signed a waiver stating that the property was sold "as is," and that no representations were made as to liens or encumbrances. Id.

In December 2003, the trustee of Wells Fargo published a notice of foreclosure on the First Trust Deed. Id. During the foreclosure sale, the plaintiff purchased Parcel 17. Id. Following the foreclosure sale, the plaintiff sued Wells Fargo and its trustee for violating the TCPA. Id. In particular, the plaintiff argued that Wells Fargo had a duty to disclose the existence of the First Trust Deed during the foreclosure sale of the Second Trust Deed. Id. The plaintiff also argued that the defendants violated the TCPA by misrepresenting the existence of encumbrances on the Second Trust Deed. Id.

The trial court dismissed the plaintiff's TCPA claims, and the Tennessee Court of Appeals affirmed. Id. at *5. In particular, the court of appeals affirmed dismissal because the plaintiff's injuries were "reasonably avoidable":

> The injury of which Plaintiff complains, i.e., having to purchase Parcel 17 a second time at the foreclosure of the First Trust Deed after first purchasing Parcel 17 at the foreclosure of the Second Trust

34

Deed, was reasonably avoidable by Plaintiff. Plaintiff admitted that he knew of the existence of a prior lien when he attended the foreclosure of the Second Trust Deed. Plaintiff simply assumed, despite his having signed a waiver that stated that the property was sold 'as is' with no representations or guarantees as to any liens or encumbrances having been made, that his purchase at this foreclosure would assure him clear and unencumbered title. Plaintiff could have reasonably avoided the alleged injury either by making further inquiries regarding a lien that he discovered when he researched the title prior to the foreclosure of the Second Trust Deed or simply by not purchasing the property at the first foreclosure sale in light of his knowledge of the existence of this other deed of trust. However, Plaintiff did not do so. **As Plaintiff had the information and the means to avoid the alleged injury, defendants' failure to disclose cannot be considered an unfair practice under the Tennessee Consumer Protection Act** . . . Given this, defendants have negated an essential element of Plaintiff's claim under the Tennessee Consumer Protection Act . . .

Id.(emphasis added). In sum, the court found that because the plaintiff had the "information and means to avoid the alleged injury," he could not sustain a TCPA action. Id.

As the Tennessee Court of Appeals stated in Tucker, an injury is not "reasonably avoidable" if the defendant withheld important information from the consumer, engaged in overt coercion, or exercised undue influence "over a highly susceptible class of consumers." 180 S.W.3d at 117. Even assuming that ADT engaged in unfair or deceptive trade practices, the alleged injury was "reasonably avoidable" by Plaintiff. First, there is no evidence that ADT representatives intentionally withheld information from Plaintiff. In fact, it appears that the failure to include the cellular back-up in the 2006 Contract was nothing more than an innocent mistake. *See* Plaintiff's Dep., Doc. 29-1, at 135:13-136:5; Part III.B.1 (finding that ADT representatives did not intentionally or recklessly fail to include the cellular back-up in the 2006 Contract). Second, there is no evidence that Mr. Flack or other ADT representatives engaged in overt coercion. [Id.]. The

evidence shows that Plaintiff, an experienced businessman, was given the 2006 Contract to read, but chose not to. Like the plaintiff in <u>Burkhart</u>, Plaintiff had the "information and means to avoid the alleged injury." 2007 WL 1836850, at *5. There is no evidence that Plaintiff was under duress, or was coerced into signing the contracts. Third, Plaintiff is not a member of a "highly susceptible class of consumers." In fact, the opposite is true: Plaintiff is the owner and manager of two businesses. This includes the Spring Hill Market, a gas station and convenience store, and East Tennessee Scrap, a proprietorship involved in the business of transporting scrap metal. [Plaintiff's Dep., Doc. 29-1, at 12:2-15:25]. Plaintiff manages twenty to thirty employees at East Tennessee Scrap, in addition to managing the Spring Hill Market. Based upon his management and business experience, Plaintiff is clearly not a member of a "highly susceptible class of consumers."

After ADT demonstrated an absence of a genuine issue of material fact regarding whether Plaintiff's alleged injuries were "reasonably avoidable," the burden shifted to Plaintiff to raise a genuine issue of material fact. *See* <u>Celotex</u>, 477 U.S. at 324. In response, Plaintiff failed to provide affidavits or other documents raising a genuine issue for trial. Fed. R. Civ. P. 56(c)(4). The conclusory allegations in Plaintiff's Response [Doc. 30] are insufficient to satisfy his burden. Accordingly, Plaintiff's TCPA claim is **DISMISSED WITH PREJUDICE**.

### E.      Plaintiff's Breach of Contract and Negligence Claims are Barred by the Exculpatory Clauses

As the Tennessee Supreme Court made clear in <u>Houghland v. Sec. Alarms & Servs., Inc.</u>, parties are generally free to limit their liability in actions for breach of contract or negligence. 755 S.W.2d at 773 ("Limitations against liability for negligence or breach of contract have generally been upheld in this state in the absence of fraud or overreaching.") (citations omitted). In particular, the Tennessee Supreme Court has upheld the use of exculpatory clauses in the alarm services

industry.  Id.  Courts will enforce exculpatory clauses unless there is *"fraud, misrepresentation or violations of the Tennessee Consumer Protection Act*."  Gross, 2007 WL 3171155, at *6 (citing Underwood, 2007 WL 1412040, at *5).  *See also* Part III.A.

The Court previously dismissed Plaintiff's claims for intentional misrepresentation, fraudulent concealment, fraudulent inducement, negligent misrepresentation, and violation of the TCPA.  *See* Parts III.B-D.  Having determined that there was no "fraud, misrepresentation or violations of the Tennessee Consumer Protection Act," Gross, 2007 WL 3171155, at *6, the Court will uphold the exculpatory clauses in the 2006 Contract and the 2007 Contract.  Under both exculpatory clauses, Plaintiff agreed to allocate any risk of property damage or loss to his insurance company.  [Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, Doc. 29, at 4-5].

Because Plaintiff expressly agreed to allocate any property damage or loss to his insurance company, and because the Court finds that enforcing the exculpatory clauses does not violate the public policy of Tennessee, Plaintiff's negligence and breach of contract claims are dismissed.  *See* Houghland, 755 S.W.2d at 773 (recognizing that "[l]imitations against liability for *negligence or breach of contract* have generally been upheld in this state in the absence of fraud or overreaching") (emphasis added) (citations omitted).  While this rule may be harsh, the Court cannot nullify exculpatory clauses absent fraud, negligent misrepresentation, or a violation of the TCPA.  Gross, 2007 WL 3171155, at *6.  As the Tennessee Court of Appeals explained in Underwood:

> In the case at bar, Ms. Underwood signed a contract with language
> that bears a remarkable likeness to the contract at issue in Houghland.
> By signing the contract, Ms. Underwood acknowledged that National
> Alarm [the alarm system company] was not an insurer of property.
> The contract also provided that, in the event National Alarm was held

liable for any loss relating to the provision of alarm services under the terms of the contract, then National Alarm's liability would be limited to $250. . . .

Ms. Underwood has not alleged any fraud or intentional misrepresentation that might provide this Court with justification for voiding the contract or any portion thereof. Although this may be a harsh result, given the substantial damages sustained by Ms. Underwood and her family in the house fire, we are bound by precedent to enforce the liquidated damages clause that was signed by Ms. Underwood and a National Alarm representative.

2007 WL 1412040, at *6 (citing Houghland v. Sec. Alarms & Servs., Inc., 755 S.W.2d at 771)

(upholding an exculpatory clause in an alarm services contract following a residential burglary).

Accordingly, pursuant to the Tennessee Supreme Court's decision in Houghland v. Sec. Alarms & Servs., Inc., 755 S.W.2d at 773, Plaintiff's claims for breach of contract and negligence are

**DISMISSED WITH PREJUDICE**.

IV.     **CONCLUSION**

Based upon the foregoing, ADT's Motion for Summary Judgment [Doc. 28] is **GRANTED**, whereby Plaintiff's claims are **DISMISSED WITH PREJUDICE**.


**IT IS SO ORDERED**.

**ENTER:**


        s/ Thomas W. Phillips
        United States District Judge